UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 13-48-GFVT |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| AARON ROBERTS, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

When a federal agent came to his residence, Defendant Aaron Roberts made incriminating statements concerning his role in manufacturing methamphetamine. After being indicted and arraigned several months later, Roberts filed a motion to suppress the statements he made to the federal agent because the agent did not first notify him of his Fifth Amendment rights under *Miranda v. Arizona*. [R. 78.] The Court referred the matter to Magistrate Judge Hanly A. Ingram, who, after conducting a hearing and considering additional briefing from both parties, recommends denying Roberts' motion to suppress. [R. 111.] Roberts timely objects to the Magistrate Judge's recommendation, arguing that a reasonable person in Roberts' position would not have felt free to leave when being questioned by law enforcement, and that both his statements and their direct and derivative fruit must be suppressed. [R. 120.] These objections trigger this Court's obligation to conduct a *de novo* review. *See* 28 U.S.C. § 636(b)(1)(c). Having reviewed the entire record, including the parties' briefs and relevant case law, for the reasons set forth below, Defendant Roberts' objections to the Magistrate Judge's Recommended Disposition shall be **OVERRULED** and his motion to suppress shall be **DENIED**.

# I

The Magistrate Judge conducted an evidentiary hearing on the issues in Roberts' motion to suppress, and also requested further post-hearing briefing. [R. 91.] The Recommended Disposition sets out the factual and procedural background of the case, and Roberts does not offer any particularized challenge to the Magistrate Judge's factual recitation beyond the context of the enumerated objections.[1] Moreover, the testimony of the two witnesses who testified at the hearing was consistent and, as Roberts has not presented any other evidence, there does not appear to be any factual dispute concerning the relevant facts. Accordingly, the Court need not sift through again every fact found by the Magistrate Judge, and will only briefly describe what has already been thoroughly discussed and incorporated into the record.

Upon receiving information from a defendant in a related case, United States Forest Service Special Agent Bob O'Neill went to the address listed as Roberts' residence in a database that contained information about Roberts' pseudoephedrine purchases. [R. 111 at 2.] Upon Agent O'Neill's first visit to that address, he spoke with Roberts' parents, who were seated on the front porch of the residence. [*Id*. at 3.] Roberts' parents said that Roberts was not there, that he had taken their car without permission, and that they did not know where he was. [*Id*.] When Agent O'Neill told them that he had received a complaint that Roberts was manufacturing methamphetamine in one of the outbuildings on their property, Roberts' father gave him permission to search the outbuilding. [*Id*.] Agent O'Neill testified that when he did so, he found materials needed to manufacture methamphetamine in the outbuilding, and that he confiscated

---

[1] Had Roberts sought such review, a specific objection would have been required. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). It bears noting, however, that in reviewing the record and applying the required deference to the Magistrate Judge's factual findings, the Court cannot, in any instance, conclude that they are clearly erroneous, which would be a necessary finding were the Court inclined not to uphold them. *See United States v. Esteppe,* 483 F.3d 447, 452 (6th Cir. 2007).

those materials. [R. 120 at 2.]

The next day, Agent O'Neill returned to the residence accompanied by Captain Charles Peace of the Kentucky Army National Guard Joint Readiness Recon Station, and two other members of the National Guard, all of whom arrived in one un-marked vehicle. [R. 111 at 3.] According to Agent O'Neill, the Roberts residence is located about 20 to 25 yards off the highway and has a paved "pull-off area" instead of a driveway. [*Id*.] Roberts' father was in the front yard, told the officers that Roberts was in "his room," and asked Roberts' mother to go get him. [*Id*. at 3-4.] Agent O'Neill testified that Roberts came out of the house and sat down unprompted in the only chair on the small front porch. [*Id*. at 4.] Agent O'Neill testified that he identified himself as a special agent involved in conducting an investigation of manufacturing methamphetamine, and that he had been there the day before and found evidence of those activities on the property the previous day. [R. 120 at 3.] Agent O'Neill did not tell Roberts he would be arrested, saying that he was not there to take him to jail that day, but asked if Roberts were willing to cooperate and said that if he did, he would favorably report Roberts' cooperation to the U.S. Attorney's office. [*Id*.; R. 111 at 4.] According to O'Neill's testimony, Roberts at that point started talking to him, saying that "meth was destroying the community" and agreeing to cooperate because the problem was "so bad" that it "needed to be cleaned up." [R. 111 at 4.]

Agent O'Neill then proceeded to conduct an interview with Roberts that lasted about an hour. [*Id*.] Agent O'Neill admitted that he did not advise Roberts of his Miranda rights at any point, nor did he specifically tell him that he did not need to answer questions or inform him that he could end the interview at any time. [*Id*. at 6.] During the interview, Agent O'Neill was standing on the ground in front of the center of the porch about five feet away from Roberts with his left foot up so he could use his knee as a writing surface, and Roberts remained seated in the

3

chair with his head higher than the agent's. [*Id*. at 4.] Agent O'Neill further testified that he did not threaten to arrest or detain Roberts, and denied telling him that he had enough evidence to arrest him. [*Id*. at 6.] Agent O'Neill also testified that Roberts never asked for an attorney, nor did he ask to take any breaks during the interview although Agent O'Neill would have allowed him to take a break had he requested it. [*Id*.] As a result of the interview, Roberts incriminated both himself and others in a signed statement as well as orally. [R. 120 at 4.]

Captain Peace initially accompanied Agent O'Neill to the porch but then joined the other two members of the National Guard shortly afterward who were talking to Roberts' father about topics unrelated to the investigation near their car about twenty to twenty-five yards away from the house. [R. 111 at 5.] Captain Peace testified that they were far enough away that they could not hear the conversation between Roberts and Agent O'Neill. [*Id*.] He also testified that he never heard Agent O'Neill raise his voice to Roberts, nor did he overhear Agent O'Neill make any statements or threats about arresting him or take any other action toward him. [*Id*. at 6.] The National Guard members and Agent O'Neill were all armed, but their guns remained in the holsters and were never brandished. [*Id*. at 5.] None of the four men wore uniforms. [R. 99 at 3.] Agent O'Neill carried handcuffs, but they were concealed in pouches, and he never removed them. [R. 111 at 5.] The National Guard members do not carry handcuffs and do not have the authority to arrest anyone. [*Id*.] They were present for security purposes and could have detained Roberts if he had tried to flee, but Captain Peace testified that they would not have chased him unless Agent O'Neill instructed them to do so or unless Roberts posed a threat of imminent danger to another person. [*Id*.]

**II**

The Fifth Amendment to the United States Constitution provides that "[n]o person…shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. This right is guarded by the prophylactic rule of *Miranda v. Arizona*, which requires law-enforcement officers to give warnings, including the right to remain silent, before conducting a custodial interrogation. 384 U.S. 436, 444 (1966); *Stansbury v. California,* 511 U.S. 318, 322 (1994). However, "police officers are not required to administer *Miranda* warnings to everyone. . . they question." *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). The warnings are required only "when there has been such a restriction on a person's freedom as to render him 'in custody.'" *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *Oregon,* 429 U.S. at 495 (1977)). In determining whether an interrogation occurred while a defendant was "in custody," courts are to consider the totality of the circumstances surrounding the encounter "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Stansbury,* 511 U.S. at 322) (internal quotation marks omitted). This inquiry is objective, focusing on how "a reasonable person in the suspect's position would perceive his or her freedom to leave," rather than the suspect's actual mindset. *J.D.B. v. N. Carolina,* 131 S.Ct. 2394, 2402 (2011) (internal citations and quotation marks omitted); *Yarborough,* 541 U.S. at 667. In making this determination, this Court is guided by the following factors articulated by the Sixth Circuit:

> (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*Hinojosa*, 606 F.3d at 883 (citing *Panak,* 552 F.3d at 465, *United States v. Swanson,* 341 F.3d 524, 529 (6th Cir. 2003), *United States v. Salvo,* 133 F.3d 943, 950 (6th Cir. 1998)).

Here, Roberts presents three objections to the Magistrate's findings. As an initial matter, the Court notes that Roberts primarily reiterates what he has already argued in his previous briefs and at the hearing, rather than making specific objections to the analysis or factual findings contained in the recommended disposition. However, given that this is *de novo* review, the Court will address Roberts' "objections" in turn and analyze the totality of the circumstances in which the incriminating statements were made. *See United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2002).

**A**

First, Roberts argues that the government should have had the burden of proof in establishing that the statements at issue are admissible, and implies that the Magistrate Judge erred by citing a non-precedential Sixth Circuit case stating the opposite. [R. 120 at 5-7.] In support of this argument, Roberts relies on another Sixth Circuit case, *United States v. Short*, 790 F. 2d 464, 467-468 (6th Cir. 1986), which placed the burden on the prosecution to demonstrate that a confession is admissible. [*Id*. at 5-6.] The Court notes, however, that the context of *Short* concerns the voluntariness of statements made during a custodial interrogation, while here, the preliminary issue was whether a custodial interrogation actually took place at all since the government argued, and the Magistrate Judge found, that Roberts was not in custody when he made the statements at issue. The full context of the case cited by the Magistrate Judge explains that in a suppression hearing the party seeking suppression of statements "based upon a failure to receive his Miranda warnings" has the burden of showing "by a preponderance of the evidence" that he was "subjected to a custodial interrogation." *United States v. Lawrence*, 1989 WL

6

153161, at *5 (6th Cir. Dec. 18, 1989) (citing other Sixth Circuit, Fifth Circuit, and Supreme Court precedents). Had the Magistrate determined that Roberts was in custody, the next inquiry would have concerned whether he made the statements voluntarily, and then perhaps *Short* would have been more applicable. Thus, there was no error in relying on caselaw applicable to analyzing whether a custodial interrogation occurred rather than the cases to which Roberts cites.

Moreover, regardless of which party had the burden of proof at what time, the fact that Judge Ingram stated the burden was on Roberts did not seem to affect the ultimate outcome in a dispositive manner. Even if the Court presently applies *Short* in the way Roberts requests, the government has clearly demonstrated that Roberts was not in custody when he made the statements at issue, as will be explained below. Thus, there is no need to further address the semantics of Roberts' arguments about Sixth Circuit precedent on the burden of proof in this case since it will not affect the ultimate determination.

**B**

Next, Roberts contends that he was "in custody," apparently objecting to the Magistrate Judge's application of the factors in *United States v. Panak*, 552 F.3d 462 (6th Cir. 2009). Primarily, Roberts reiterates the same arguments he made previously to the Magistrate Judge. The Magistrate Judge used similar reasoning as that used in *Panak* to find that Roberts was not in custody. While Roberts agrees that *Panak* is the Sixth Circuit's leading case on the issue of whether a custodial interrogation has occurred, he contends that certain factors should be applied differently in his situation. [R. 120 at 8.] As stated above, there are four main factors that the

7

Court must analyze under *Panak* in determining issues of whether a defendant was "in custody."[2]

Roberts concedes that the first factor of location weighs against him since the interview occurred on the front porch of his residence. [R. 120 at 9.] The Court in *Panak* specifically found that under well-established precedent "when police question a suspect in a residence, the encounter often will not rise to the kind of custodial situation that necessitates Miranda warnings." *Panak*, 552 F.3d at 464 (quoting other sources) (internal quotation marks omitted). While Roberts' parents likely owned the house where he was, he had a room there and resided there with some regularity. The parties agree that this factor weighs against Roberts' position. Roberts also concedes that several other factors weigh in favor of a finding that he was not in custody. Concerning the length and manner of questioning, Roberts does not dispute that the interview lasted about an hour, which is similar to the duration of the interview in *Panak*. [R. 120 at 9.] Roberts also admits that, like the defendant in *Panak* who was not "in custody," Roberts was not physically restrained in any manner, and that he was never told he could not leave or that he was required to answer questions, all of which also weigh against a finding that he was in custody. [*Id.* at 9-10.] Roberts also does not dispute that neither Agent O'Neill nor the members of the National Guard brandished their guns at any point, did not raise their voices, and did not use or threaten violence in order to elicit his statements.

Roberts, however, argues that several other aspects of the interview made it coercive. Specifically, Roberts points to the fact that he was not told he did not need to answer questions or that he could end the interview at will, and that O'Neill "explicitly threatened" Roberts "by

---

[2] In analyzing these factors, the Sixth Circuit in *Panak* found that the defendant was not in custody during an interview where law enforcement officers did not give her a *Miranda* warning, and thus no custodial interrogation occurred. *Panak*, 552 F.3d at 464.

emphasizing his knowledge of" Roberts' alleged guilt. [R. 120 at 10.] Thus, while the parties agree that the location, the duration, and the fact that Roberts was not physically restrained weigh in favor of finding that Roberts was not in custody, Roberts argues that the manner of the interview combined with the fourth factor of not telling Roberts that he need not answer questions should "tip" the *Panak* analysis in his favor. [*Id*.]

The Court agrees that the fourth factor concerning whether Roberts was told he need not answer questions weighs in favor of suppression, a point also acknowledged by the Magistrate Judge. However, this is only one of the four factors in *Panak*, and the Court's analysis must be based on the totality of the circumstances. *Swanson*, 341 F.3d at 528. Roberts attempts to distinguish his case from *Panak* concerning this fourth factor because in *Panak*, the court indicated that if "the officers by word or action asserted their arrest authority or had they threatened [defendant] by emphasizing their knowledge of her guilt, the absence of such advice *might* have made all the difference." *Panak*, 552 F.3d at 468 (emphasis added). According to Roberts, Agent O'Neill asserted his arrest authority and emphasized his knowledge of Roberts' guilt by telling Roberts that he was not there to arrest Roberts on that day, by mentioning the evidence he had found in the outbuilding the day before, and by telling Roberts that his cooperation would be favorably reported to the U.S. Attorneys' office. [R. 120 at 11.] Roberts contends that these comments all implied that Roberts would be arrested and was facing potential criminal liability, and that such implications were enough to establish a "coercive, freedom-inhibiting atmosphere" of custodial interrogation. [*Id*.]

First, as an initial matter, the part of the *Panak* case quoted by Roberts in which he attempts to distinguish his situation from that of the defendant in *Panak*, omits the first part of the sentence in the actual opinion, and the context in which the Sixth Circuit said it. [*See* R. 120

9

at 10 (quoting *Panak*, 552 F.3d at 468).] While discussing the factor of whether the defendant was told she did not have to answer the officers' questions, the Panak court stated that although giving such a warning "likely would have guaranteed the noncustodial nature of this interview," its absence did not also guarantee that a custodial interrogation occurred. *Panak*, 552 F.3d at 468. The court next stated that "[i]n a close case, sure enough, the existence of such advice might affect the outcome." *Id*. The next sentence begins by saying, "Had this interview occurred in a less congenial location. . . ," and then finishes with the part Roberts quotes about the officers asserting arrest authority or threatening the defendant. *Id*. Thus, even if Roberts is correct that the officers in the present case asserted their authority to arrest him or threatened him with a knowledge of his guilt, such conditions would not guarantee that he was in custody for *Miranda* purposes because the interview occurred in his home (a "congenial location" for the *Panak* court), and because this is not "a close case," as further explained herein. *See id*. Even then, the court did not say such circumstances necessarily would change the outcome but only that they *might* have.

Second, concerning the fact that Agent O'Neill admittedly did not tell Roberts that he did not have to answer questions and that he could leave or end the interview at any time, the court in *Panak* found that such advice "is one factor among many" to analyze, and that the Sixth Circuit has "never held that it is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting." *Panak*, 552 F.3d at 467. Indeed, the court went on to explain that although this factor is "a particularly important" one in showing that no custody occurred, it would also be "strange" to say that "a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings." *Id*.

Third, the Court also notes that the National Guard members did not have authority to arrest anyone, nor did they assert such authority, and Agent O'Neill specifically stated he was not there to arrest Roberts on that day. While perhaps that statement implied he could arrest Roberts at some point in the future, the statement also should have led a reasonable person in Roberts' position to understand that this was not an arrest-like situation in which he could not leave – which is the more appropriate focus of any analysis of whether a custodial interrogation occurred. *See Panak*, 552 F.3d at 468.

Fourth, although Agent O'Neill told Roberts about what he had found in the outbuilding the day before and his suspicions of Roberts' involvement, the question for this analysis is "not whether the investigator knew of evidence inculpating the interviewee," nor is it whether the defendant himself knew of incriminating evidence against him. *Panak*, 552 F.3d at 469. The custody analysis should be undertaken "from the perspective of a reasonable person innocent of any crime," and should focus on whether the investigator used any incriminating evidence "to create a hostile, coercive, freedom-inhibiting atmosphere." *Id*. Even if Agent O'Neill told Roberts that he had incriminating evidence against him, such knowledge still is only relevant if the communication *also* "would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id*. (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). Here, although O'Neill denied telling Roberts that he had enough evidence to arrest him, Roberts likely could have inferred that someone had enough evidence to do so, given how much O'Neill knew and the evidence he had confiscated the day before. However, the important question is whether this implication would have made a reasonable person feel that his "freedom of action had been curtailed to the degree associated with a formal arrest." *Id*. at 468, 470. The court in *Panak* repeatedly emphasized the importance of analyzing the factors it described in

11

light of how they affect a reasonable person's perception of their freedom to leave. Given the other factors discussed above, and those already conceded by Roberts, his knowledge that Agent O'Neill possessed incriminating evidence by itself would not have made a reasonable person feel that he could not leave. Roberts was questioned by only one officer who was not wearing a uniform, arrived in an un-marked car, made no attempt to physically restrain Roberts, did not exhibit a show of force, and did not raise his voice. Roberts was seated on the front porch of his home with his parents nearby, he never requested an attorney, and he apparently began his statements to Agent O'Neill with comments about how methamphetamine needed to be cleaned up because it was destroying the community. Neither Agent O'Neill nor the National Guard members employed their numbers, authority, weapons, or even the information they had about Roberts' illegal activities in a manner that would cause a reasonable person in Roberts' position to feel that he could not leave. Thus, the combination of circumstances in this scenario, considered in their totality, does not support a finding of custodial interrogation.

## C

Finally, Roberts contends that certain statements and items of evidence should be suppressed because the government did not show that it obtained this evidence from any source independent of the statements Roberts made to Agent O'Neill. Although Roberts lists this as an objection, it is actually an argument that flows from his second argument – i.e., if Roberts was in custody and if his statements are suppressed, then the fruit of those statements should also be suppressed. However, since the Court has already found that Roberts was not in custody at the time he made the statements in question, this third "objection" is moot.

## III

Thus, weighing the above-referenced factors, the Court reaches the same conclusion as

the Magistrate Judge in finding that Roberts was not "in custody" when questioned by Agent O'Neill at his home on August 13, 2013. The circumstances relevant to a proper custodial calculus were thoroughly considered by the Magistrate Judge and do not support a finding that a reasonable person in Roberts' position would not have perceived his freedom was restricted in a manner functionally similar to a formal arrest. Therefore, no *Miranda* warnings were necessary, and neither his statements nor evidence recovered as a result of his statements need to be suppressed. Accordingly, the Court having considered the record and being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Aaron Roberts' Objections to the Magistrate's Recommended Disposition [**R. 120**] are **OVERRULED**;

2. The Magistrate Judge's Recommended Disposition [**R. 111**] is **ADOPTED** as and for the opinion of this Court; and

3. Defendant Aaron Roberts' Motion to Suppress [**R. 78**] is **DENIED**.

This 30th day of June, 2014.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge